IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                          Criminal Action No. 3:21-cr-131

DEQUANE AQUIL MCCULLERS &
ANTHONY CORNELIUS BROWN, JR.,
  Defendants.

## OPINION

Dequane Aquil McCullers and Anthony Cornelius Brown, Jr., move to suppress the guns found on them during frisks performed by Richmond City Police Department ("RPD") detectives. McCullers and Brown ("the defendants") argue that the Court should suppress the guns because the detectives lacked reasonable suspicion to stop and pat them down. (ECF Nos. 26, 27.) Further, Brown argues that the detectives prolonged his stop in violation of the Fourth Amendment, and McCullers argues that the detectives violated the Fifth Amendment by asking him whether he had ever been convicted of a felony without giving him *Miranda* warnings.

The Court finds that the detectives had reasonable suspicion to stop and frisk the defendants, and the detectives did not unlawfully prolong Brown's stop. Further, the brief inquiry of McCullers at the beginning of the *Terry* stop did not require *Miranda* warnings.

The Court will, therefore, deny the defendants' motions to suppress.

## I. FACTS[1]

At 5:00 a.m. on July 23, 2021, Detective Benito Frias with RPD's Strategic Violence Interdiction Unit[2] observed an Instagram video shared by J.S., a known member of a gang that operates in Belt Atlantic apartments ("the Apartments").[3] At the time, Frias and other members of his unit were working from their office at 200 West Grace Street in Richmond, Virginia. Although Frias did not know when J.S. had recorded the Instagram video, he did know that J.S. had posted the video between one and two hours before Frias observed it. The video shows J.S. and five others standing in front of the 4024 building of the Apartments while "brandishing, pointing, and recklessly handling multiple firearms, including high-capacity rifle-style firearms and handguns." (ECF No. 30, at 2; Gov't Ex. 1.) Two people in the video stood out to Frias: one person wearing a black hat with a white emblem and distinctive yellow and red underwear and

---

[1] The Court held an evidentiary hearing on the motions to suppress on February 1, 2022. The Court draws the below facts from the testimony and exhibits presented at the hearing.

[2] The Strategic Violence Interdiction Unit investigates violent offenders and the illegal possession and sale of guns in Richmond, Virginia. Members of this unit routinely observe social media, often Instagram, to look for illegal sales of guns or drugs.

[3] The Apartments used to be called Midlothian Village Apartments. RPD understands the Apartments to be an area with a propensity for violence. Indeed, a few months before the incident at issue here, a shooting occurred in the Apartments which left a mother and her three-month-old baby dead. It has been the experience of the detectives and officers who patrol the Apartments that one of the causes of violence at the Apartments is gang activity, sometimes prompted by disagreements cast on social media.

holding a gun to the camera,[4] and another person wearing a purple jacket with long dreadlocks and holding a gun in each of his hands.[5]

After Frias observed the Instagram video, he immediately showed it to his colleague, Detective Jessica Spence. Spence quickly pulled up real-time surveillance video from the Apartments; the Apartments share access to their surveillance video with the RPD because of the prevalence of violence at the Apartments. On the surveillance video, Spence saw a vehicle leaving and three people milling about in front of the 4024 building. One of the individuals appeared to carry a drum magazine in his waistband, and another individual looked like someone Spence had seen in the Instagram video—Brown, wearing his purple jacket. Frias, watching the surveillance video with Spence, also spotted Brown because of his purple jacket; he noted that he had also observed Brown in the Instagram video.

Frias and Spence then showed Sergeant Brian Rogers the Instagram video and the surveillance video from the Apartments. They collectively decided to go to the Apartments. The group got into two vehicles, one marked as an RPD vehicle and the other unmarked. Spence, Rogers, and Detective Farnsworth traveled in the unmarked vehicle, while Frias and Detective John Story traveled in the marked vehicle. The drive to the Apartments lasted between ten and twenty minutes. While en route, Spence continued to monitor the real-time surveillance video from the Apartments. Spence saw that Brown still milled about the 4024 building's open stairwell; she shared this information with Rogers, Farnsworth, Frias, and Story.

---

[4] The detectives later identified this person as McCullers. For clarity, the Court will refer to this person as McCullers throughout the "Facts" section of this Opinion. The Court notes, however, that the detectives did not know McCullers's identity until after they seized him.

[5] The detectives later identified this person as Brown. For clarity, the Court will refer to this person as Brown throughout the "Facts" section of this Opinion. The Court notes, however, that the detectives did not know Brown's identity until after they seized him.

When the officers arrived at the Apartments, Spence, Rogers, and Farnsworth parked on a nearby street and approached from the front parking lot while Frias and Story parked in the back parking lot and approached from there. Frias and Story saw Brown and McCullers, both of whom Frias recognized from the Instagram video: McCullers because of his hat with the white emblem and bright underwear, and Brown because of his purple jacket and dreadlocks. As Frias and Story approached, Brown and McCullers began to walk away through the 4024 building's open stairwell, into the courtyard on the other side, and up the 4026 building's staircase.[6]

### A. Brown

Frias drew his weapon and rushed up behind Brown, commanding him to stop. Brown reached the first landing of the staircase and moved his hands in front of his torso. Frias then commanded Brown to stop reaching. Brown quickly raised his hands and turned to face Frias. Frias then handcuffed Brown and patted him down. (Gov't Ex. 5, at 9:13.)[7] During the pat down, Brown told Frias that he had a colostomy bag on his stomach; Frias, therefore, conducted a more cursory pat down than usual. After five minutes in handcuffs, Frias asked for and Brown provided his name, date of birth, and social security number.[8] (Gov't Ex. 5, at 9:18.) Frias texted this information to Story, who was in charge of running all the information collected from the suspects

---

[6] Government Exhibit 5 provides a map of the Apartments.

[7] When citing body-worn camera footage throughout this Opinion, the Court will refer to the time stamp found in the upper right-hand corner of the videos.

[8] During these five minutes, the four other detectives at the Apartments collected the guns recovered from the three other suspects—McCullers, Mr. Miller, and Mr. Brandon—secured the guns, and started collecting information from the suspects. *See infra* p. 7.

4

that morning.[9] After nineteen more minutes, Frias moved Brown—still in handcuffs—from the first landing of the staircase to a seat on the stairs below. (*Id.* at 9:37.)

Story, meanwhile, had walked back to where he had parked the marked police vehicle, (Gov't Ex. 10, at 9:21–9:27), and started running information on the suspects, (*id.* at 9:27–9:58). One of the suspects had provided the wrong social security number so Story, to get the accurate social security number, moved the marked vehicle closer to the stairwell where some of the suspects remained. (*Id.* at 9:43–9:44.) After twenty-nine minutes of running information, Story was nearly finished when Spence asked if Brown's information had come back. (*Id.* at 9:56.) Story told Spence that it had and that Brown was "good to go." (*Id.*) Spence then called to Frias that he could release Brown. At this point, Brown had been in handcuffs for forty-three minutes.

Frias began to remove Brown's handcuffs. (Gov't Ex. 5, at 9:56.) But before Frias got the handcuffs off, another detective told Frias to wait; Rogers had directed Spence to check the area around where the detectives had observed Brown to ensure he had not thrown aside a gun. Frias then sat Brown back down on the stairs in handcuffs and walked around the area with Spence. Finding nothing, Frias returned to Brown about two and a half minutes later. (*Id.* at 9:58.) Frias

---

[9] The Strategic Violence Interdiction Unit often manage themselves this way: having just one officer run all the information collected at the scene. This practice minimizes the risk of overlooking something, for instance mistakenly releasing a suspect who has outstanding warrants.

Depending on the situation, the detectives may run a suspect's information through two systems: the Virginia Criminal Information Network ("VCIN") and Teletype. The detectives access VCIN from the computer in their marked vehicle or through the radio. The detectives run the following information through VCIN: name, date of birth, and social security number. With this information, VCIN tells the detectives whether the suspects have any outstanding warrants and, by providing pictures from the Department of Motor Vehicles, whether the suspects are who they say they are.

If the detectives find a gun on a suspect, they turn to Teletype. The detectives must make a telephone call to access Teletype's information. After providing Teletype with a suspect's name, date of birth, and social security number, Teletype tells the detectives whether the suspect has ever been convicted of a felony.

stood Brown up, helped Brown down the stairs, and prepared to take a picture of Brown when Frias noticed something poking out of Brown's crotch area. Frias then patted Brown down and felt the frame of a gun, which Farnsworth recovered.[10] (*Id.* at 9:59.) Farnsworth then took the gun to the marked vehicle. (*Id.* at 10:02.)

About twenty minutes later, Frias walked Brown to wait near the marked vehicle, and Story called Teletype to determine whether Brown had ever been convicted of a felony.[11] (Gov't Ex. 10, at 10:22.) Frias began preparing a summons for Brown in case he had no prior felony convictions and could be released with a summons. (Gov't Ex. 5, at 10:27.) But six minutes after calling Teletype, Story learned that Brown has two prior felony convictions. (*Id.* at 10:28.) The detectives then arrested Brown.

### B. McCullers

While Frias approached Brown, Rogers went up a staircase in the 4026 building to find McCullers, who stood in a doorway on the third-floor landing. Rogers heard Frias command the suspects in the stairwell to stop; from this, Rogers concluded that Frias felt he had reason to stop and speak with the people in the stairwell. According to McCullers, he was knocking on an apartment door when Rogers commanded him to show his hands and get on the ground. Farnsworth followed Rogers up the stairs. Rogers then handcuffed McCullers, who lay facedown on the ground, and frisked him. Rogers felt a gun, which Farnsworth recovered from McCullers's underwear. Rogers admitted that McCullers was not free to leave after he placed him in handcuffs.

---

[10] Forty-six minutes passed between when Frias first handcuffed Brown and when Frias felt the gun in Brown's pants.

[11] During these twenty minutes, Story wrote a summons and released Miller and helped Spence write another summons and release Brandon. (Gov't Ex. 10, at 10:02–10:22.) Miller and Brandon were the two other suspects at the scene. *See infra* p. 7.

Rogers then asked McCullers whether he had any other weapons; McCullers said no. Next, Rogers asked for McCullers's name, which McCullers provided. McCullers also told Rogers that he had his state-issued identification in his front pants pocket; Rogers retrieved it. Rogers asked McCullers where he lived; McCullers explained that he lived at the address on his identification. Rogers then stood McCullers up and walked him down a couple steps before sitting him down. Rogers then asked, "Dequane, you ever been convicted of a felony?" (Gov't Ex. 9, at 9:15.) McCullers responded in the affirmative. (*Id.*) Rogers's conversation with McCullers occurred with a few minutes of their initial encounter.

\*     \*     \*

Although the interactions with Brown and McCullers are at issue in these motions, the detectives who responded to the Apartments on July 23, 2021, also encountered two other individuals. Specifically, while Frias approached Brown and Rogers approached McCullers, Spence stopped and detained Brandon, and Story stopped and detained Miller. After patting them down, Spence and Story recovered guns from Brandon and Miller. These seizures—of Brown, McCullers, Brandon, and Miller—all happened nearly instantaneously in and around the 4026 building's open stairwell.

## II. DISCUSSION

The defendants seek to exclude the guns found in their possession after RPD detectives seized and patted them down. Both argue that the detectives lacked reasonable suspicion to stop and frisk them. Brown argues that the detectives unlawfully prolonged the *Terry* stop by keeping him in handcuffs for more than forty-six minutes before finding the weapon that precipitated his arrest. And McCullers says the Rogers violated his Fifth Amendment rights by asking McCullers, before reading his *Miranda* rights, whether he had ever been convicted of a felony.

### A. Reasonable Suspicion for Terry *Stop and Frisk Analysis*

According to the defendants, the detectives lacked reasonable suspicion to stop and frisk them for several reasons: the detectives did not know when J.S. filmed the Instagram video; at least one hour had passed between the posting of the video and Frias observing it; the detectives did not know whether the guns in the video were real or fake; they had no reason to believe any of the individuals who remained at the Apartments still possessed guns; and they could not have recognized McCullers from the video because of his inconspicuous outfit.

#### 1. *Legal Standard*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A police officer may "seize a person for a brief investigatory stop if he 'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.'" *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). To justify a stop, the officer must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. The officer must have "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440 (1980). "The level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Slocumb*, 804 F.3d at 682 (quoting *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013)).

A police officer may frisk a suspect during a *Terry* stop only if she has "a particularized and objective basis for suspecting that the person to be frisked is armed and dangerous." *United States v. Powell*, 666 F.3d 180, 185–86 (4th Cir. 2011); *see also United States v. Buster*, No. 21-

8

4101, slip op. at 10 (4th Cir. Feb. 22, 2022) ("[S]uch searches may lawfully be conducted as part of an investigatory stop only when an officer 'reasonably . . . conclude[s] in light of his experience' that 'the persons with whom he is dealing may be armed and *presently* dangerous.'" (quoting *Terry*, 392 U.S. at 30)). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 186 (quoting *Terry*, 392 U.S. at 27).

Courts consider the totality of the circumstances when deciding whether an officer had reasonable suspicion to support a *Terry* stop and frisk. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). "In reviewing police action, courts must look at whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of 'the practical experience of officers who observe on a daily basis what transpires on the street.'" *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (quoting *United States v. Branch*, 537 F.3d 328, 336–37 (4th Cir. 2008)). "The Government bears the burden of articulating facts sufficient to establish reasonable suspicion . . . and although the standard of proof 'is obviously less demanding than that for probable cause,' the government 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" *Powell*, 666 F.3d at 186 (internal citation omitted) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

2. *Analysis*

When the detectives seized the defendants, the detectives had seen the Instagram video, depicting the defendants and others, including at least one known gang member, brandishing multiple guns, including high-capacity, rifle-style guns. After arriving to the Apartments, Frias recognized Brown and McCullers from the Instagram video because of their clothing— McCullers

9

with his black hat with a white emblem and bright underwear,[12] and Brown with his purple jacket and dreadlocks.[13] Although Frias did not know when the group had filmed the Instagram video, the following facts render the belief that the group had recently filmed the video reasonable: the detectives arrived at the Apartments between 75 and 120 minutes after J.S. posted the video; Frias came upon the defendants milling about the same building in front of which the Instagram video had been filmed; and the defendants wore the same distinctive clothing at the time of the stop as Frias had observed them wearing in the video. And although the detectives did not know whether the guns waved in the video were real or fake, the following facts make reasonable their suspicion of reckless firearm handling: the group filmed the video at the Apartments, a location known for gun violence; the detectives recognized J.S. as a gang member; and the detectives had previously observed gang members post inciting videos on social media to goad each other to violence.[14]

---

[12] McCullers questions whether Frias recognized him from the Instagram video; McCullers contends that Frias could not have seen his distinctive clothing—his black hat with the white emblem and his bright underwear—when McCullers walked away. Having reviewed the body-worn camera footage and heard Frias's testimony, the Court finds that Frias recognized McCullers from the Instagram video when he approached the Apartments.

[13] "[T]he collective knowledge doctrine applies . . . 'when at least some, but not all, of an investigative team has actual knowledge of facts necessary to a finding of probable cause. The knowledge is imputed from one officer to another such that the officers collectively are assumed to have actual knowledge of the imputed fact.'" *United States v. Pulley*, 987 F.3d 370, 379 (4th Cir. 2021) (quoting *United States v. Blauvelt*, 638 F.3d 281, 289 (4th Cir. 2011)). The collective knowledge doctrine applies equally to the question of reasonable suspicion. *See United States v. McRae*, 336 F. App'x 301, 305 (4th Cir. 2009). Thus, Frias's reasonable suspicion to stop and frisk McCullers is imputed to Rogers.

[14] In Virginia, recklessly handling firearms amounts to a Class 1 misdemeanor. Va. Code § 18.2-56.1(A). To the extent the defendants contend that they had completed this misdemeanor before the detectives arrived at the Apartments and the detectives cannot sustain their reasonable suspicion based on a completed misdemeanor, that argument fails.
Deciding whether officers may use a *Terry* stop to investigate a completed misdemeanor "turns on the nature of the crime, how long ago the suspect committed it, and the ongoing risk of the individual to the public safety." *United States v. Jones*, 953 F.3d 433, 437 (6th Cir. 2020); *see also United States v. Beasley*, No. 2:20cr42, 2020 WL 6377211, at *7 (E.D. Va. Oct. 30, 2020).

Taken together, these facts provided ample reasonable suspicion that the defendants recklessly handled firearms, that they might have still had guns in their possession, and that they posed a danger to the officers and the surrounding residences. Thus, Frias and Rogers lawfully stopped and patted down the defendants.[15]

Further, the steps Rogers and Frias took during the *Terry* stops to protect their safety and maintain the status quo—drawing their weapons, handcuffing the defendants, moving them in handcuffs—did not impermissibly expand the *Terry* stop. The situation necessitated these decisions by the detectives, who entered a high-crime area and encountered people they reasonably suspected of carrying weapons. *See United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) ("These officers reasonably suspected that Elston was armed and dangerous, and thus did not exceed the limits of a *Terry* stop by drawing their weapons and placing Elston in handcuffs."); *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995) ("As a general rule, officers conducting a *Terry* stop are authorized to 'take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." (alteration in original) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). Having reviewed the evidence, the Court finds legitimate the officers' safety concerns and necessary all the steps they took with such concerns in mind.

---

Here, each of these factors weigh in the detectives' favor; they reasonably suspected that earlier that morning, in a residential area with a propensity for violence, the defendants had waved about multiple guns, including high-capacity rifle-style guns, possibly to provoke opposing gangs.

[15] The Fourth Circuit's recent decision in *United States v. Buster* does not change this conclusion. Indeed, the Court emphasized "the limits of [its] holding"; "We do not address situations where a firearm was found on a suspect's person . . . ." *Buster*, slip op. at 12.
Further, because the Court finds that the detectives had reasonable suspicion to stop and frisk the defendants, the Court need not address the defendants' arguments that the detectives lacked probable cause to arrest the defendants.

### B. Length of Brown's *Terry* Stop

Brown also argues that the detectives unlawfully prolonged his *Terry* stop such that it became an arrest without probable cause.

#### 1. Legal Standard

"A *Terry* or investigative stop can cross the line and turn into an arrest under certain circumstances. The test for determining whether an individual is in custody or under arrest is whether, under the totality of the circumstances, the 'suspect's freedom of action is curtailed to a degree associated with formal arrest.'" *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). To remain a *Terry* stop, a seizure "must last no longer than necessary to verify or dispel the officer's suspicion." *Leshuk*, 65 F.3d at 1109.

"There is no hard and fast rule for how long a [*Terry*] stop may last." *United States v. Avagyan*, 164 F. Supp. 3d 864, 888 (E.D. Va. 2016); *see United States v. Sharpe*, 470 U.S. 675, 694 (1985) (Marshall, J., concurring). In *United States v. Sharpe*, DEA agents arrested the defendant thirty to forty minutes after the initial stop. 470 U.S. at 679. Despite the stop's duration, because the agents pursued their "investigation in a diligent and reasonable manner" with no unnecessary delay, the Court found the duration of the *Terry* stop reasonable. *Id.* at 687–88.

#### 2. Analysis

Brown waited forty-six minutes in handcuffs before Frias found the gun that led to Brown's arrest. Brown contends that the length of this stop exceeded the brief, investigative detention allowed under *Terry*. Brown argues that as soon as Story heard back from VCIN that Brown had no outstanding warrants, Frias should have released him.

The detectives stopped and patted down the defendants based on reasonable suspicion of reckless weapons handling. During the forty-six minutes Brown remained in handcuffs, the

detectives diligently and reasonably investigated the four suspects for recklessly handling weapons. Although the detectives could have quickened the encounter by having multiple detectives run the suspects' information, the Court finds reasonable the unit's decision to appoint one detective to run the information, a decision that ensures thoroughness and avoids mistakes. And although Story learned that Brown had no outstanding warrants before he told Spence so, the unit often holds all suspects at the scene until the detectives have determined how to handle each of the suspects (e.g., who will they arrest and who will they release). The unit follows this practice to ensure safety; the detectives do not want to release a suspect who then gathers a group to return to the scene and interfere with the investigation. Having reviewed the body-worn camera footage and heard testimony from the detectives, the Court finds this practice reasonable; adhering to this practice did not unlawfully prolong Brown's *Terry* stop.[16]

After Frias learned that Brown had no outstanding warrants, Frias and Spence—on orders from Rogers—checked the area around where they had seen Brown walk to be sure he had not discarded a gun.[17] This took Spence and Frias between two and three minutes and did not unlawfully prolong the stop; Spence and Frias spent these additional minutes investigating their

---

[16] During the hearing on the motions to suppress, Brown made much of the detectives releasing two other suspects—Brandon and Miller— with summonses. The detectives released Brandon and Miller during the ten minutes preceding Story's call to Teletype with Brown's information. (Gov't Ex. 10, at 10:13, 10:20.) According to Brown, this undermines the detectives' testimony about keeping all the suspects at the scene to ensure safety.

The Court finds this argument unpersuasive. When the detectives released Brandon and Miller, the encounter had entered its final stages; all that remained for the detectives to do was run Brown's information through Teletype, a process that took six minutes. Further, the detectives had developed a rapport with Miller and Brandon, lessening the safety concern about releasing them.

[17] Frias spent many quiet minutes with Brown. To the extent Brown argues that Frias should have surveyed the area for discarded guns during this time, this argument fails. Frias likely stayed with Brown to ensure he did not try to escape and for safety reasons. The Court finds this decision reasonable.

reasonable suspicion that Brown was armed and recklessly handled guns. To the extent Brown argues that the detectives unreasonably extended the *Terry* stop by spending these additional minutes surveying the area for discarded guns, the Court dismisses this argument. During a *Terry* stop, police must "diligently pursue[] a means of investigation . . . likely to confirm or dispel their suspicions quickly." *Sharpe*, 470 U.S. at 686. Throughout Brown's stop, Frias, Spence, Story, Rogers, and Farnsworth did just that, working as a unit to investigate their reasonable suspicion that the suspects recklessly handled firearms.[18]

### C. McCullers's Fifth Amendment Rights

McCullers says that the detectives had him in custody when they asked him whether he had ever been convicted of a felony. According to McCullers, by not reading his *Miranda* rights before asking him this question, the detectives violated his Fifth Amendment rights.

#### 1. Legal Standard

"[T]he Fourth Circuit has held that *Miranda* warnings are not required when a person is questioned during a routine vehicle stop or *Terry* stop, provided that the officer did not exceed the permissible scope of the *Terry* stop." *United States v. Wright*, No. 5:18cr5, 2018 WL 5046091, at *5 (W.D. Va. Oct. 17, 2018) (citing *Leshuk*, 65 F.3d at 1108–09). The Fourth Circuit confirmed this bright-line rule in *Leshuk*, a case in which two deputy sheriffs approached two defendants in the woods to investigate reported marijuana plants. When the deputies came upon the defendants, the deputies frisked them and, after determining that neither defendant was armed, asked the defendants' "purpose for being there" and "about the contents of the backpacks and the garbage bag" nearby. *Leshuk*, 65 F.3d at 1107. Notably, the deputies did not handcuff the defendants or

---

[18] Because the Court finds that Brown's and McCullers's Fourth Amendment rights remained intact during the July 23, 2021 interactions, the Court need not address the government's argument that the attenuation doctrine saves any illegal seized evidence.

draw weapons on them. According to the defendants, the deputies violated the Fifth Amendment by not administering *Miranda* warnings before asking these questions. But the Fourth Circuit affirmed the district court's ruling that this encounter amounted to a *Terry* stop and, therefore, did not require *Miranda* warnings.

Coercive *Terry* stops—encounters in which the police draw weapons and place suspects in handcuffs—like the one McCullers experienced, push this bright-line rule to its limits. Outside the *Terry* context, to determine whether the police must read *Miranda* warnings to a suspect, courts examine whether the suspect is in custody and subject to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) (explaining that *Miranda* excludes statements only when "a suspect in custody is subject to interrogation"). "The determination of whether a defendant is in custody is 'objective' and focuses on 'how a reasonable man in the suspect's position would have understood his situation.'" *United States v. Uzenski*, 434 F.3d 690, 704 (4th Cir. 2006) (quoting *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985)). "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *United States v. Jones*, 818 F.2d 1119, 1123 (4th Cir. 1987) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "In other words, the court considers whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Hashime*, 734 F.3d 278, 282–83 (4th Cir. 2013) (alteration in original) (quoting *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007)). The following factors "are often most important to a custody determination:"

> (1) Whether defendant was informed that he was not under arrest and that he was free to terminate the questioning;
> (2) Whether defendant possessed unrestrained freedom of movement during questioning;
> (3) Whether defendant voluntarily submitted to questioning;

>   (4) Whether the agents employed strong arm tactics or deceptive stratagems during questioning;
>   (5) Whether the atmosphere of the questioning was police-dominated; and
>   (6) Whether defendant was placed under arrest at the termination of the questioning.

*United States v. Jefferson*, 562 F. Supp. 2d 707, 713–14 (E.D. Va. 2008) (footnotes omitted).

And so arises the tension between the bright-line rule (no *Miranda* warnings required during *Terry* stops)[19] and the legal standard governing whether suspects are "in custody" for *Miranda* purposes (whether a reasonable person in the suspect's position would not have felt free to leave the encounter). In some police-citizen encounters, such as the one at issue here, the police stop a suspect based on reasonable suspicion and stay within the permissible scope of the *Terry* stop, *but* the police apply restraint to the suspect to the degree associated with formal arrest. *Cf. Leshuk*, 65 F.3d at 1109–10 (explaining that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes"). Other circuits recognize that "a coercive *Terry* stop requires [*Miranda*] warnings." Katherine M. Swift, *Drawing a Line Between* Terry *and* Miranda: *The Degree and Duration of Restraint*, 73 U. Chi. L. Rev. 1075, 1076 (2006). But in the Fourth Circuit, "so-called *Terry* reasonableness means *Miranda* warnings are not required, even if the stop was coercive." *Id.* And the Fourth Circuit's opinions bind this Court.

### 2. *Analysis*

For all the reasons explained in Section II.A.2, Rogers had reasonable suspicion to stop and frisk McCullers. Nothing Rogers did—drawing a weapon, ordering McCullers to the ground, handcuffing him, and patting him down—transformed the interaction from a *Terry* stop into an arrest. Rogers did these things to ensure officer safety and maintain the safety of the scene. *See*

---

[19] The Fourth Circuit did not exclude coercive *Terry* stops from this rule.

*Leshuk*, 65 F.3d at 1110 (explaining that to remain a *Terry* stop, any actions taken by the officers—like handcuffing the suspect, threatening force, or moving a suspect—must be "necessary to protect their safety, maintain the status quo, and confirm or dispel their suspicions"). Although a reasonable person in McCullers's position would not have believed he was not free to leave—indeed, Rogers admitted McCullers was not free to leave—that does not transform the *Terry* stop into custodial interrogation. *Id.* at 1109 ("In fact, *Terry* stops customarily involve 'detentions where the person detained is not technically free to leave while the officer pursues the investigation.'" (quoting *United States v. Manbeck*, 744 F.2d 360, 376–77 (4th Cir. 1984), *cert. denied*, 469 U.S. 1217 (1985))).

When Farnsworth recovered the weapon from McCullers, the interaction remained a *Terry* stop; although McCullers remained on the ground in handcuffs, yielding to the detectives, these facts do not transform the interaction from a *Terry* stop into an arrest. Equipped with new reasonable suspicion that McCullers illegally possessed the gun, the officers then asked McCullers several questions to dispel this suspicion, including whether he had ever been convicted of a felony. All this occurred with a few minutes of McCullers's initial encounter with the police. Because this interaction remained a *Terry* stop, the officers need not have read McCullers his *Miranda* warnings before asking him this question. *See United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010) (Davis, J., concurring in part) ("But *Miranda* warnings are unnecessary before questioning a suspect during a *Terry* stop."); *United States v. Jones*, 27 F. App'x 198, 199 (4th Cir. 2001) ("*Miranda* warnings are not required when a person is questioned during a routine traffic stop or a *Terry* stop.").

The Court believes that, at some point, a *Terry* stop becomes "custodial," requiring *Miranda* warnings before questioning of a suspect. The police cannot simply stop someone

17

because of an articulable suspicion and conduct a full-scale interrogation under the guise of a *Terry* stop. But something different happened here. The police stopped McCullers and asked a few questions within minutes of the stop. Under Fourth Circuit precedent, they did not have to give McCullers his *Miranda* warnings before asking these questions. Court will therefore deny the motion to suppress McCullers's statement.

### III. CONCLUSION

For the foregoing reasons, the Court will deny the defendants' motions to suppress. (ECF Nos. 26, 27.)

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 16 March 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge